No. 2545.

## JERRY DUGGER *v.* THE STATE.

1. ACCOMPLICE TO MURDER—INDICTMENT.—The second count of the indictment (being the count upon which this conviction was had) charges that certain persons, to the grand jurors unknown, and whom the grand jurors are unable to describe, did kill and murder one Ellick Brown, and that defendant, prior to the commission of said murder by said unknown persons, did unlawfully, wilfully and of his malice aforethought, advise, command and encourage said unknown persons to commit said murder, said defendant not being present at the commission of said murder by said unknown persons. It was objected to the indictment that it neither named nor gave a description of the unknown persons who committed the murder of Brown. *Held,* that the objection is not sound, and the indictment is sufficient, its purpose and effect not being to charge the unknown persons as the "accused" in this case, but to charge the defendant as an accomplice to the murder of Brown.

2. SAME.—THE CHARGE OF THE COURT in this case should, more explicitly than it did, have instructed the jury that, to convict, they must find that the defendant was not present at the commission of the murder, and that the murder was committed by a person or persons who had been advised, commanded or encouraged by the defendant to commit it.

3. SAME—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction as an accomplice to murder.

APPEAL from the District Court of Lampasas. Tried below before the Hon. W. A. Blackburn.

Under the second count in the indictment, the appellant in this case was convicted as an accomplice to murder in the first degree. A life term in the penitentiary was the penalty assessed by the verdict.

Hugh Brown was the first witness for the State. He testified that the deceased, Ellick Brown, was his brother. The said Ellick lived in Lampasas county, Texas, about one mile east from the residence of the witness. He was a bachelor, and lived alone. About noon on the first day of January, 1887, the defendant came to the witness's house and told him that his brother Ellick was dead; that he had just found his dead body in his house. The witness and defendant went at once to Ellick's house. On the way the defendant said that he went to the gate of Ellick's yard and hallooed three times for him, and, receiving no answer, he went to the door, which was closed, pushed it open and saw Ellick's body, covered, except the feet and legs, and lying on a pallett on the floor, the feet being tied with a rope. The witness and defendant did not go into the house on reaching Ellick's place. The tracks on the ground leading from the gate to the door and returning were the tracks which the defendant said he made on that morning. The yard gate was thirty or forty feet north from the house. Blood was found on the crib and on the ground under the crib. It had the appearance of being fresh blood. The witness and defendant did not go into the house, nor did they touch the body until the coroner's jury arrived. A crowd soon collected, and defendant remained the balance of the day with the witness, about the premises where the body was. The crib where the witness found the blood was about thirty yards distant from the house. Witness saw only the tracks which the defendant claimed to be his, but did not examine the whole of the yard. Three days had then elapsed since the witness was at Ellick's house, but he saw Ellick on the day before the night of his death. Two trails led to the gallery from the bloody places at the crib, and witness saw footsteps at the said bloody places.

J. L. Harvey testified, for the State, that he lived in Lampasas county, about three miles distant from the house in which Ellick Brown lived. He saw the body of Ellick Brown at the said house on the first day of January, 1887. He reached the body about three o'clock in the evening, and served as one of the coroner's jury. The defendant was one of the large number of persons present at Brown's house when the witness

arrived. The body of Brown lay on a pallet on the floor, in front of the fire place. The body, except the feet, was covered with a quilt, and there was a piece of quilt around the neck and over the mouth. The feet were tied together and drawn up to meet the hands, which were also tied together, a piece of rope being used for that purpose. The skull was broken in, evidently by the blow of a blunt instrument. The throat and neck were bruised, the bruises on the throat resembling finger prints, and indicating choking with hands. Bruises on the breast and side appeared to have been made by boot heels. The skin was rubbed off the back, and indicated that the body had been dragged some distance. A trail leading from the gallery of the house to the crib, about twenty-five yards distant, was found. Blood was found on some logs of the house, and on the ground under the projecting ends of some logs. The indication at that point was that something had been recently hanged there. The trail mentioned by the witness was made by the dragging of such an object as a man's body over the ground. In the house, on the floor, and between the body and the door, a gun was found, the stock lying nearest and pointing towards the door. The witness thought that gun belonged to the deceased. A butcher knife was found on the floor of the house, and a six shooter pistol in a box in a corner of the house. The house was in great disorder. The scattered dishes and bloody floor indicated that a terrific struggle had recently taken place in the house. After the inquest the witness discovered the tracks of two horses which left the deceased's gate, crossed the road about thirty feet distant, and continued in a north direction to a branch about seventy-five yards distant, thence down the branch until they reached a road leading west, from which point they could not be trailed. The horses that made those tracks traveled in a gallop. Defendant lived about three miles north from Ellick Brown's place.

Cross examined, the witness said that he was familiar with the localities of Lampasas county, and knew where nearly everybody lived in the neighborhood of Brown's house. Several parties lived north from Brown's house, and among them J. H. Bright, whose house was about a mile and a half distant. The witness could not tell from the appearance of the dining table whether or not more than one person ate supper at the house of the deceased on the previous night. The table was

not " set," but there was a quantity of table ware—cups, sau-
cers, plates, etc.—on it. The gun found in the house was a
Winchester rifle, and was said to belong to the deceased. A
piece of a nubia was found in the hands of the deceased. That
piece did not resemble the nubia that was worn about the neck
of the deceased. The bruises on the neck of the deceased in-
dicated choking and not hanging.

H. Wallace was the next witness for the State. His testimony
was substantially the same as that of the preceding witness,
except that he thought, from the character of the bruises on
the neck, the deceased had been hung. In one of the hands
the witness found a piece of nubia and a gray hair which he
took to be a hair from a man's whiskers The body was found
on the floor, but a depression in one of the beds indicated that
it had been occupied, at least for a while, on the previous night.
Deceased was a bachelor with good property, and always ap-
peared to be sufficiently supplied with money. Witness did
not know how much money the deceased usually kept, or was
reputed to keep on his person. Witness saw some black hair
on the crib where the blood was, but was unable to say whether
or not it was human hair.

J. M. Cagle testified, for the State, that he heard of the kill-
ing of Ellick Brown on January 2, and on that day went to the
scene of the killing with Deputy Sheriff Halbert and a man
named Edwards. They found the tracks of three horses which
left deceased's house, two of them being the tracks mentioned
by previous witnesses. They trailed those two tracks no
further than to the point in the road where the other witnesses
lost them, but the track of the third horse, which showed a
bent nail, was trailed by the witness and his companions a
mile further in the direction of McAnelly Bend, to a road where
it was lost. While following this trail the witness and his
party met the defendant and E. Brown, going towards Hugh
Brown's house. E. Brown asked witness what progress he
was making. Witness replied that he was following a horse
track, and defendant said: " A track is d—d poor evidence."
The tracks followed by witness and his party went towards the
house of Jim Baker, where a party was given on the night of
the murder. The horses that made those tracks may have been
going to Jim Baker's party, but the witness first struck them
at the house of the deceased; and two of the said tracks
traveled down a branch before taking a road.

Jim Baker testified, for the State, that he reached Ellick Brown's house between one and two o'clock on the evening of the day the body was found. Defendant, among others, was then at the house. While standing on the gallery with defendant the defendant said to witness that he was sorry he was the first person to find Brown's body, but that somebody had to be first. Defendant then suggested that perhaps Brown had been hung, and advised witness to climb to a projecting log of the crib and see if he could find any indications of hanging. The witness did so, and found the imprint of a rope on the said log. On his cross examination the witness said that blood was found on the ground, and on the side of the crib immediately under the projecting log, and that, when defendant suggested the probable hanging of deceased, the various parties standing around were advancing and discussing theories as to how the killing was done.

J. H. Bright was the next witness for the State. He testified that in December, 1886, and January, 1887, he lived on Lynch's creek, in Lampasas county, Texas, about one mile from the house of the defendant, and about the same distance from the house of the deceased. The witness and the defendant were at work together in a cedar brake, in October or November, 1887, when one of deceased's yearlings passed them. Defendant remarked: "That is a fine, fat yearling, and will make good beef." Witness replied: "Yes; I believe I will go and work for Mr. Brown and see if I can't get him to kill it, and get some of the meat." Defendant said: "Old man Brown never eats beef." A minute or two later he said to witness: "What would you think if I were to tell that old man Brown will be killed some day? Will you believe it?" The witness replied that he would not believe it, and the defendant said: "Well, he will be killed some day, and his money will be the inducement." The defendant then asked witness if he thought "Uncle Ellick" (deceased) had any money about him. Witness replied that he did not know, but that deceased had money sometimes. Defendant then said: "If the old man had any money around him, a person would have to hang him, bruise him up, and may be so burn him, before he would give it up or tell where it was." Witness thought that the defendant then asked him if he would join some men to rob or kill the deceased. The witness became angry and replied that he could not conceive how a man could do such a thing. Nothing more

was said about the matter until an hour later, when the wit-
ness asked the defendant: "If I guess the names of the men
you want me to go in with, will you tell me?" He replied: "I
have told you too much already." The witness then asked the
defendant: "What part will you have to perform?" He re-
plied: "All I will have to do will be to find him, or see that it
is done complete." On the morning of the Thursday or Fri-
day after the murder, and while the coroner's inquest was
still in session, the defendant came to witness's house, and he
and witness went to the wood pile. Defendant then said: "You
remember the talk we had in the cedar brake? Don't tell any
thing that passed between us then." When he left that place,
he looked back and said: "Don't tell anything; don't let any
five hundred dollars buy you. If you do tell, you will get your
light blown out. If I don't, somebody else will."

Cross examined, the witness said that Brown was supposed
to have been killed on Friday night. He heard of the killing
about one o'clock on the next day, at Wallace's store. The
witness, on hearing of the killing, went home and thence to
the house of deceased. Defendant was then there, but no con-
versation occurred there between him and witness. Witness
remained at deceased's house until evening, and attended the
burial on the next day, and saw the defendant at the grave.
He did not see the defendant again until the following Thurs-
day or Friday, when he came to witness's house and asked
witness not to tell what passed between them in the cedar
brake. No third person was present at either of the coversa-
tions between witness and defendant. The witness left Lam-
pasas county and moved to Tom Green county in May, 1887.
He did not tell anybody about the cedar brake conversation
until some time after he located in Tom Green county. His
wife was the first person to whom he divulged the defendant's
said proposition to kill and rob the deceased. Defendant left
Lampasas county in February, 1887. He told witness, when he
left, that he was going to Ellis county. Mr. Martin was the
second person the witness told about defendant's proposition.
That was in November, 1887. Mr. Martin lived in Tom Green
county. In making those disclosures the witness was not influ-
enced by the reward offered for the apprehension of the mur-
derers of Ellick Brown. He did not then know that a reward
was offered, but had since learned that fact. He was not now
testifying because of that reward. He expected no part and

wanted no part of it in the event the defendant should be con-
victed. The reason why the witness did not report the defend-
ant's proposition to kill and murder the deceased was that he
was afraid of being killed if he did so. Defendant passed
witness's house about ten o'clock on the morning after the
death of the deceased. He said that he was going to Ellick
Brown's house to see if he could not sell his place to Brown.
Defendant's place had been on the market for some time. Wit-
ness did not know who were the defendant's "friends."

The State closed.

George W. Lewis, the first witness for the defense, testified
that he spent the Thursday night previous to Brown's death at
the defendant's house. Witness and his son went to see de-
fendant, who was sick. Witness sat up the larger part of that
night, and left the defendant better on the next morning. Be-
sides the witness and his son, no person other than defendant's
family and his brother John stayed with the defendant on that
night. The reputation of the defendant was that he was a
peaceable, law abiding citizen. He was a poor man. Witness
bought defendant's place on February 2, 1887, paying him a fair
price for the same. Defendant had then been trying for months
to sell his place, and once told the witness that he thought he
could sell it to Ellick Brown.

Several other witnesses testified as did the witness Lewis as
to the reputation of defendant as a law abiding citizen.

The defendant's daughter and his brother John, testifying in
his behalf, located the defendant in his house throughout the
night of the murder.

*A. G. Walker* and *J. L. Lewis*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. There are two counts in the indictment; the
first charges that the defendant and a certain other person, or
persons, to the grand jurors unknown, acting together, with
malice aforethought, did kill and murder Ellick Brown, etc.;
the second charges that certain persons, to the grand jurors
unknown, and whom the grand jurors are unable to describe,
did kill and murder said Ellick Brown, and that the defendant,
prior to the commission of said murder by said unknown per-
sons, did unlawfully, wilfully and of his malice aforethought

advise, command and encourage said unknown persons to commit said murder, the said defendant not being present at the commission of said murder by said unknown persons.

On the trial of the case, after the evidence had been introduced, the district attorney abandoned the first count and dismissed the same, relying upon the second count only for a conviction, and a conviction was had upon said second count, the punishment assessed being confinement for life in the penitentiary.

Defendant excepted to the indictment because it does not allege the names of the unknown person or persons who committed the murder, or give any description of them. We are of the opinion that the court did not err in overruling the exception. Those provisions of our code which require the name of the accused to be alleged in the indictment, if known, or, if unknown, that a reasonably accurate description of him be given (Code Crim. Proc., arts. 420-425), are not applicable in this case, because said unknown person or persons are not the "accused." The defendant, Jerry Dugger, is the "accused" in this indictment, and is named as such in the indictment. The other person or persons, being unknown, could neither be named nor described, nor was it essential to this prosecution that they should be; nor was it essential to a conviction of the defendant that the evidence should disclose who they were.

In support of the second count in the indictment (the count upon which this conviction is based), there is no testimony except that of the witness Bright. He testified, in substance, that, a month or perhaps two months prior to the murder, the defendant said to him that Brown would some day be killed, and that his money would be the inducement. He then asked witness if he thought that Brown had any money around him. Witness replied he did not know, but that sometimes he did have. He then said if Brown had any money around him a person would have to hang him, bruise him up and maybe so burn him before he would give it up or tell where it was. He then asked witness if he, witness, would go in with some men to rob or kill Brown. Witness answered: "No," and after the lapse of about an hour asked the defendant if he would tell him the names of the men, and defendant answered: "I have told you too much already." Witness then asked him what part he would perform. He said all he would have to do would be to find him and see that it was done complete. Said witness

testified further that about one week after the murder defendant called his attention to the conversation above related, and told him not to tell anything about it, and stated that if he did tell about it he would be killed.

Is this testimony sufficient to sustain this conviction? We are clearly of the opinion that it is not. It does not show that the unknown murderer or murderers were advised, commanded or encouraged by the defendant in the commission of the crime. It does not show that the "men" to whom he alluded in the conversation with the witness Bright were the murderers of Brown. Brown may have been murdered by other men than those—by men whom the defendant did not know, or had never seen—and if so, he certainly was not an accomplice in the murder. It is not pretended that the witness Bright was a principal in the murder, and Bright is the only known person who was advised, commanded or encouraged by the defendant to commit the murder. It may be that the defendant was an accomplice in the atrocious crime shown by the evidence to have been perpetrated by some person or persons, but we can not pronounce his guilt legally from the evidence before us. If the witness Bright is to be credited, there is strong grounds for suspecting that the defendant was in some way criminally connected with the murder, but suspicion is not proof, and the law demands proof, and such proof as leaves no room for reasonable doubt of guilt.

With respect to the charge of the court, we do not think it subject to the objections made to it. It is, in our opinion, a clear and correct exposition of the law of the case, except, perhaps, that it should have more distinctly instructed the jury that, to find the defendant guilty, they must believe from the evidence that the defendant was not present at the commission of the murder, and that the murder was committed by a person or persons who had been advised, commanded or encouraged by the defendant to commit it.

Because the evidence does not sustain the conviction, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*